Ross C. Goodman, Esq.
Nevada Bar No. 7722
GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, Second Floor
Las Vegas, Nevada 89101
Telephone: (702) 383-5088
Facsimile: (702) 385-5088
Email: ross@goodmanlawgroup.com
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ALLEGIANT AIR, LLC, | Case No. 2:15-cv-00580-GMN-PAL |
| Plaintiff, | **PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION** |
| v. | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION, et al., | |
| Defendants. | |

COMES NOW Allegiant Air, LLC ("Plaintiff" or "Allegiant") and submits this Motion for a Temporary Restraining Order and a Preliminary Injunction. As explained herein, the motion seeks to enjoin the International Brotherhood of Teamsters ("IBT") – the certified collective bargaining representative of Allegiant's pilots – and the other Defendants from engaging in, encouraging, or calling an unlawful strike against Allegiant by its pilots in violation of the Defendants' duties under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (2014) ("RLA").

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101

28

27

**SUMMARY**

26   One of the express purposes of the RLA is to "avoid any interruption to commerce or to

25   the operation of any carrier engaged therein." 45 U.S.C. § 151a.  In support of that goal, the RLA

24   places a duty on "all carriers, their officers, agents and employees to exert every reasonable effort

23
    to make and maintain agreements concerning rates of pay, rules, and working conditions, and to
22
    settle all disputes, whether arising out of such agreements or otherwise, in order to avoid any
21
20   interruption to commerce or to the operation of any carrier growing out of any dispute between

19   the carrier and the employees thereof." 45 U.S.C. §152, First.

18   In particular, strikes over employees' rates of pay, rules, and working conditions as

17   embodied in collective bargaining agreements – known as "major disputes" in RLA parlance –

16   are permitted solely after the parties have exhausted the statute's procedures governing such

15
    disputes, which are "virtually endless" and "purposely long and drawn out." *Burlington N. R. Co.*
14
    *v. Maint. of Way Emps.*, 481 U.S. 429, 444 (1987); *Bhd. of Ry. and S.S. Clerks, Freight Handlers,*
13
12   *Exp. & Stations Emps. v. Florida E. Coast R. Co.*, 384 U.S. 238, 246 (1966).  The initial step is

11   direct negotiations between the carrier and the union.  If those negotiations do not result in an

10   agreement, the next step is mediated negotiations under the auspices of the National Mediation

9    Board ("NMB"), the government agency tasked with oversight of collective bargaining under the

8    RLA.  45 U.S.C. § 157, First.  If the NMB determines that the parties have reached an impasse, it

7
    offers binding interest arbitration to the parties.  45 U.S.C. § 155, First.  If either or both of the
6
    parties declines the proffer of arbitration, a 30-day "cooling off" period ensues.  *Id.*  "If, and only
5
4    if, negotiation, mediation, arbitration, and the cooling-off period fail to produce an agreement,

3    may the parties resort to self-help – the employer by unilaterally changing rates of pay, rules, or

211
GOODMAN LAW
GROUP
A PROFESSIONAL   2
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

-2-

28

27    working conditions, the union by striking." *National R.R. Passenger Corp. v. Transport Workers*

26    *Union of America*, 373 F.3d 121, 124 (D.C. Cir. 2004).

25    IBT was certified to represent the Allegiant pilots in August 2012, and the parties are in

24    negotiations for a collective bargaining agreement covering the pilots. Those negotiations

23    currently are being mediated by the NMB. It is undisputed that the RLA's major dispute process

22    has not been exhausted; indeed, although the IBT requested that the NMB release the parties from

21
20    mediation and proffer arbitration, the NMB has declined to rule on that request and instead

19    directed the parties to return to the bargaining table in April.

18    Frustrated that they have not been able to obtain the right to strike legally under the major

17    dispute procedures, the Defendants have launched what they tellingly call "Plan B" – an illegal

16    strike designed to put economic pressure on Allegiant at the bargaining table by grinding its

15    operations to a halt. Such an action would be directly at odds with the purpose, structure, and

14
13    goals of the RLA, as well as the Defendants' duty under RLA Section 2, First. IBT and the other

12    Defendants are, as a matter of law, prohibited from engaging in any sort of self-help that would

11    disrupt Allegiant's operations while these negotiations are continuing.

10    IBT has attempted to justify its threatened "Plan B" strike on the theory that Allegiant

9     itself has violated the status quo between the parties, as established in a preliminary injunction

8     order issued by this Court in other litigation between the parties. That argument, however, is

7     nothing more than a subterfuge to illegally do what IBT cannot do legally – strike to put

6
5     economic pressure on Allegiant as the parties continue their negotiations. Moreover, IBT's

4     "status quo" argument fails because it has already sought and obtained judicial relief for the

3     "status quo" violations about which it complains, through the preliminary injunction order it

211
GOODMAN LAW
GROUP
A PROFESSIONAL    2
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

- 3 -

obtained previously.  Having obtained restoration of the "status quo," to the extent that the Court felt appropriate, IBT cannot now launch a "Plan B" strike based on those same issues.  Indeed, in crafting its preliminary injunction order, the Court was careful not to impose conditions that would disrupt Allegiant's operations.  One can hardly imagine that the Court thought IBT could or would use its preliminary injunction order as justification for a full-scale strike against Allegiant.

In industries not governed by the RLA, a union's right to strike and to declare negotiations at an impasse are much broader than they are under the RLA.  Railroads and airlines are treated differently due to the damage to interstate commerce from strikes against such companies; indeed, the history of such strikes is what led to the creation of the RLA in the first place. Therefore, it is up to the NMB to determine whether and when negotiations would no longer be productive, thus starting the countdown to a potential strike.  The NMB has not reached that conclusion with respect to Allegiant and IBT; on the contrary, it has ordered the parties back to the table later this month.  IBT may not be pleased that the NMB has not granted its request for a proffer but that does not give IBT the right to opt out of that process – or, at a minimum, to dramatically affect the parties' positions at the bargaining table – by striking.  The threatened strike should be enjoined, and Defendants directed to take affirmative steps to ensure that the pilots do not engage in illegal self-help.

### **FACTUAL BACKGROUND**

#### The Parties' Collective Bargaining History

On August 24, 2012, the NMB certified IBT as the collective bargaining representative of Allegiant's pilots.  Allegiant and IBT began direct negotiations towards a collective bargaining

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383.5088

28

27   agreement in December 2012.  Since April 2014, the parties have been in mediated negotiations

26   under the auspices of the NMB, during which the NMB controls the negotiation process,

25   determining when, where and how often the parties will meet.[1]

24       Allegiant and IBT have participated in six mediated negotiation sessions, held between

23   April and November 2014.  Additional sessions scheduled to be held in December 2014 and

22   January 2015 were canceled by the NMB due to federal budgetary issues.  The parties were

21   scheduled to meet in mid-February 2015 and, tentatively, in March 2015.  Harfst Dec. at ¶ 6.

20

19       On January 23, 2015, however, IBT requested that the NMB make a proffer of arbitration,

18   which would be the first step in obtaining a release from negotiations and, ultimately, the right to

17   engage in self-help under the RLA.  In light of IBT's pending request for a proffer, the

16   negotiation sessions scheduled for February and March 2015 were canceled.  Harfst Dec. at ¶ 7.

15

14       Allegiant told the NMB it opposed IBT's request for a proffer on the ground that it was

13   unwarranted and that the parties were nowhere close to being at impasse.  On March 23, 2015, the

12   NMB informed the parties that it was neither granting nor denying IBT's request at that time, and

11   instead was calling the parties back to the negotiating table for a session on April 30-May 1,

10   2015.  Harfst Dec. at ¶ 10.  Thus, the RLA's major dispute process has not been exhausted

9   between the parties.

8   <center>The Parties' Previously-Filed Litigation</center>

7       Almost immediately after IBT was certified, it and Allegiant disagreed over whether

6   Allegiant had an obligation to maintain the status quo during negotiations with the IBT.  When it

5   applied to the NMB to represent the pilots, IBT stated that the pilots were unrepresented at that

4   time and were not subject to a collective bargaining agreement, a position with which Allegiant

3

---

[1] *See* Declaration of Steven E. Harfst ("Harfst Dec."), attached at Tab 1, at ¶ 5.

2

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

agreed. The NMB agreed and ultimately ruled that the pilots were, in fact, unrepresented and conducted the election accordingly.[2] Under the RLA, when a union is certified to represent previously unrepresented employees (as the NMB found was the case with IBT and the Allegiant pilots), a carrier does not have an obligation to maintain the status quo when negotiating the initial contract with the union. *Int'l Bhd. of Teamsters v. N. Am. Airlines*, 518 F.3d 1052, 1057-58 (9th Cir. 2008).

Despite its position before the NMB, on September 11, 2012 – just 18 days after its certification – IBT totally reversed its position and sent to Allegiant a letter contending that the pilots had previously been represented (through an employee committee known as AAPAG) and that a document called the Pilot Work Rules ("PWR") developed by Allegiant and AAPAG constituted a collective bargaining agreement and thus established a status quo that Allegiant had to observe during contract negotiations. Allegiant promptly wrote back denying IBT's claims and pointing out the inconsistency in its position vis-à-vis that which it had taken before the NMB. Henry Dec. at ¶ 17, Ex. D.

On November 15, 2013 (more than a year after receiving Allegiant's letter stating that no status quo obligation existed), IBT filed an action in the United Stated District Court for the Southern District of Florida, alleging that Allegiant had unilaterally changed certain pilots' working conditions in violation of the status quo. In December 2013, it filed a motion for a preliminary injunction in that court relating to the alleged status quo violations. The case was transferred to the United States District Court for the District of Nevada (Case No. 2:14-cv-00043-APG-GWF) in January 2014 and assigned to the Honorable Andrew P. Gordon.[3]

---

[2] *See* Declaration of Rebecca Henry ("Henry Dec."), attached at Tab 2, at ¶ 11.

[3] *See* Docket in Case No. 2:14-cv-00043-APG-GWF (available on PACER), docket entries #1,

211

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

- 6 -

28

27    Months passed before IBT refiled its preliminary injunction motion in this Court and a

26    hearing was held on that motion in mid-June 2014.[4]  One of Allegiant's primary defenses to that

25    motion was that there was no previously-existing collective bargaining agreement covering the

24    pilots, and thus it had no obligation to maintain the status quo during negotiations with IBT.

23
      One of the status quo violations alleged by IBT pertained to how pilots bid on their
22
      monthly schedules.  In January 2012, the Federal Aviation Administration ("FAA") published a
21
20    final rule ("Part 117") intended to ensure that pilots avoid circumstances leading to fatigue.  Part

19    117 significantly changed the previous rules regarding pilot duty and rest requirements and how

18    those are calculated.  As a result of Part 117, which became effective January 4, 2014, Allegiant

17    had to make substantial changes to how it tracks pilot duty and rest times.[5]

16
      Before Part 117, Allegiant used a system called AIS to track pilot flight, duty, and rest
15
      times and to construct pilots' schedules.  AIS ensured compliance with the prior regulations but
14
      could not do that under Part 117.  Because it was not feasible to reprogram AIS to comply with
13
12    Part 117, in May 2012 (months before IBT was certified) Allegiant solicited bids from companies

11    offering appropriate software.  Wilson Dec. at ¶ 9.

10    In May 2013, Allegiant contracted with a vendor for a system – Merlot – to replace AIS

9     and ensure compliance with Part 117.  Part of the software package offered by Merlot was a

8     preferential bidding system ("PBS") for creating and awarding pilots' schedules.  PBS differed

7
      from the line-bidding process that Allegiant had used previously under AIS.  At that time,
6
5     Allegiant informed the pilots that it had entered into an agreement with Merlot and that PBS was

4     part of what would be implemented in the switch from AIS to Merlot.  Wilson Dec. at ¶¶ 10-11.

3     16, 33.
      [4] *Id.*, docket entries #51, 70-72, 77.
      [5] *See* Declaration of Robert Wilson ("Wilson Dec."), attached at Tab 3, at ¶ 7.

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

2

- 7 -

On July 22, 2014, Judge Gordon issued an order granting, in part, IBT's preliminary injunction motion.   Judge Gordon found that the PWR constituted a collective bargaining agreement that established a status quo obligation, and he required Allegiant to restore the status quo to the extent set forth in his order.[6]

Judge Gordon found that the switch to PBS from line bidding was a change to the status quo. However, he did not order a return to line bidding, concluding that doing so "would cause major disruptions to Allegiant's flight operations" because AIS was designed before Part 117 became effective. PI Order, p. 21.

Instead, Judge Gordon held that a "narrowly tailored" injunction should issue under which Merlot would be modified to address IBT's concerns about how PBS affected pilot seniority and its transparency and predictability. *Id.* The court did not specify what form those modifications should take, however, instead ordering the parties to discuss potential changes to Merlot to be implemented within 90 days of the PI Order, listing several points in the order to "guide" the parties' discussions. PI Order, pp. 22-24. Allegiant complied with that aspect of the PI Order, providing the Court with updates every 30 days on the status of those changes.[7]

Another aspect of IBT's motion related to Allegiant's ability to assign non-flying work to pilots who were unable to fly because they had lost their FAA-required medical certificate. IBT claimed in its suit that Allegiant was violating the status quo by requiring pilots to come to corporate headquarters in Las Vegas for such "light duty" work instead of permitting them to work from home or at the airport at which they were based. Allegiant contended that the PWR did not place any restrictions on where, geographically, it could assign pilots. The Court picked a

---

[6] *See* Docket in Case No. 2:14-cv-00043-APG-GWF, docket entry #79 ("PI Order"), copy attached at Tab 4.

[7] *See* Docket in Case No. 2:14-cv-00043-APG-GWF, docket entries #101, 113, 118.

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

middle ground, concluding that the status quo required Allegiant to offer such "light duty" work to pilots at their home or base airport "whenever practical" and that when Allegiant did require a pilot to travel to Las Vegas "or to another location that would require out-of-pocket travel costs," that would be at the company's expense. PI Order, pp. 16-17, 22.[8]

Allegiant has complied with the Court's preliminary injunction order, both with respect to PBS and the other changes that Judge Gordon felt were inconsistent with the status quo.[9]   It has appealed the preliminary injunction; oral argument on the appeal was held on February 2, 2015, and the parties are awaiting a decision.

## The Union's Threatened Strike

In January 2015, during the same time frame that IBT made its request for a proffer to the NMB, IBT reportedly took a strike vote among the Allegiant pilots.  According to IBT, the pilots authorized IBT to call a strike.  Harfst Dec. at ¶ 8.

In subsequent communications issued by IBT to the pilots, IBT focused primarily on the pilots' ability to strike after IBT obtained a release from the NMB and the other steps in the major dispute process were concluded.  It also discussed, however, its "Plan B" strategy and made clear that whether or not the NMB released the parties from mediation, it would strike to gain leverage

---

[8] A dispute subsequently arose between the parties regarding how the Court's order applies to a pilot who does not live near his/her base airport, and whether, under such circumstances, the company has to pay the pilot's travel expenses to perform "light duty" at his/her base airport. Allegiant filed a motion to clarify the Court's order on that point, which has been fully briefed and is awaiting the Court's ruling. *See* Docket in Case No. 2:14-cv-00043-APG-GWF, docket entries #117, 121, 124.

[9] IBT does not agree that Allegiant has fully complied with the PI Order and filed a motion to amend the PI Order, which has been fully briefed. *See* Docket in Case No. 2:14-cv-00043-APG-GWF, docket entries #125, 127, 129. More recently, IBT filed a motion for contempt sanctions against Allegiant and certain of its executives for alleged violation of the PI Order, a contention that Allegiant strongly denies. *See id.,* docket entries #131, 134, 135.

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST., 2ND FL.,
LAS VEGAS, NEVADA 89101
(702) 383-5088

- 9 -

with Allegiant at the bargaining table.[10]

For example, a March 10, 2015 communication – signed by Defendants Graff, Berger, and Jones on behalf of Local 1224 and IBT – stated in pertinent part as follows:

> We now find ourselves staring down two separate, parallel runways, and both of them may lead to a strike. We need clearance from the NMB to roll down runway A, and we get their clearance soon, but we already have clearance to roll down runway B....
>
> We do not want to roll down either of these runways, and would much rather to be able to negotiate a consensual agreement with the company. But that requires good faith by the company and a desire to work with us to reach a fair agreement. Sadly, we do not believe that the company and its executives have any interest or desire in working with us in good faith. We therefore need to be ready to roll.

Baden Dec. at ¶ 4, Ex. A.

Similarly, in a communication from the Defendants to the pilots on March 16, 2015, IBT responded to the hypothetical question, "Why is Plan B necessary?" by stating that the "strike option is the only option left to get through to executives that have repeatedly dismissed us and are openly contemptuous towards us and our choice of representative," and that it was "unrealistic to expect our executives to suddenly agree to a new contract when they won't honor the old one." In that same communication, in responding to the question of when Plan B would be pursued, IBT stated that it "will most likely be sooner than later" because IBT was concerned that "management seeks more time to strengthen their position by wearing down labor." Baden Dec. at ¶ 5, Ex. B.

Defendants also noted that the possibility that the NMB would decline its proffer request and the Ninth Circuit would reverse the preliminary injunction order "would leave us with zero strike options for the foreseeable future." Baden Dec. at ¶ 5, Ex. B. The IBT then made the

---

[10] *See* Declaration of Greg Baden ("Baden Dec."), attached at Tab 5, at ¶¶ 4-5, Exs. A-B.

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383.5088

following statement linking the status quo strike to its efforts to change Allegiant's behavior at the bargaining table:

> Management recognizes that attrition and time are our worst enemy. This is precisely why negotiations have gone nowhere in two-and-a-half years. A status quo strike not only strengthens our position and credibility, it will likely shorten, or even remove all together any appetite on management's part for an NMB strike. The overwhelming message we are getting from our pilots is loud and clear – strike at the earliest opportunity to right the wrongs the company is trying to get away with here.

*Id.*

On March 23, 2015, the same day that the NMB declined to act on IBT's request for a proffer of arbitration, IBT issued a message to its members in which it stated that its Strike Preparedness Committee intended to use a text message system to inform pilots that it was calling a strike, thus allowing it to occur without any warning or advance notice to Allegiant. The message further stated that "[i]f we go on strike, the message will be *very clear and specific*," and that "[n]o Allegiant pilot is to report for any company duty after that time." Baden Dec. at ¶ 6, Ex. C (emphasis in original). Local 1224 has also created a "strike planning" page on its website where it states that the call for a strike "will be swift" and urges the pilots to have funds set aside for four to six months in order to be financially ready for a long strike. The page also states that even once a "return to work" agreement is negotiated following a strike, it would take a "few days, possibly more" to return Allegiant's operations to normal. Harfst Dec. at ¶ 13, Ex. A

Concerned about the threat of an imminent, and illegal, strike, Allegiant took steps to obtain IBT's assurance that it would not call a strike. Though an exchange of letters with IBT counsel, Allegiant obtained IBT's commitment that it would not strike over the weekend of March 27 (though Allegiant had heard numerous reports that a strike would be called at that

time). On March 31, 2015, Allegiant representatives – including its Chief Operating Officer, Steve Harfst – met with the Defendants to discuss the alleged status quo issues and how they might be resolved. Harfst Dec. at ¶ 20. The parties concluded that meeting without having reached agreement. Harfst Dec. at ¶ 22. On the morning of April 1, 2015, Allegiant learned that IBT has in fact called a strike, through its text message system, to begin on the morning of April 2, 2015. Harfst Dec. at ¶ 23, Ex. G. Despite IBT counsel's commitment that if IBT called a strike, it would let Allegiant know, IBT provided Allegiant no notice at all of its intent to strike. Harfst Dec. at ¶ 24.

As intended by the Defendants, such a strike would inflict substantial harm on Allegiant and its passengers during one of Allegiant's busiest travel seasons. If the strike is not immediately enjoined, Allegiant will have to cancel flights and would suffer significant financial harm and damage to our goodwill. Harfst Dec. at ¶ 25. Unless the strike is enjoined by early afternoon on April 1, 2015, Allegiant will have to alert its passengers to the strike and let them know that their flights will be cancelled. *Id.* Allegiant is scheduled to transport 37,000 passengers on Easter Sunday alone and over 34,000 passengers the following day, and estimates that it would lose approximately $7.7 million for each day of a strike. In addition, because of the nature of Allegiant's flying (both with respect to the routes it flies and how often it flies those routes) and the holiday weekend, many of its passengers would not have viable options to get to their destination that day or even in the following days. Thus, the cancellation of flights due to a strike likely would have a significant impact on how passengers view Allegiant, negatively affecting the Company's goodwill. A strike also would also cause cancellation of several trips for

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND PL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

children with life-threatening illnesses through the Make-A-Wish foundation that Allegiant is scheduled to operate. Harfst Dec. at ¶ 26.

## ARGUMENT

**I. IBT MAY NOT STRIKE UNTIL THE RLA'S MAJOR DISPUTE PROCESSES HAVE BEEN EXHAUSTED**

### A. Major Dispute Strikes Are Unlawful And May Be Enjoined

The right of airline and railroad employees to strike is significantly circumscribed from that which applies to employees in other industries. That is because a strike in the airline and rail industries has a tremendous impact on so many parties not directly involved in the dispute. As the Supreme Court has observed, "[r]ailway (and airline) labor disputes typically present problems of national magnitude. A strike in one State often paralyzes transportation in an entire section of the United States, and transportation labor disputes frequently result in simultaneous work stoppages in many States." *Bhd. of R.R. Trainmen v. Jacksonville Terminal*, 394 U.S. 369, 381 (1969) (footnote omitted). Indeed, the very first of the "general purposes" listed in the RLA itself is to "avoid any interruption to commerce or to the operation of any carrier engaged therein." 45 U.S.C. § 151a. *See also Burlington N. & S.F. Ry. Co. v. Bhd. of Maint. of Way Emps.*, 286 F.3d 803, 805 (5th Cir. 2002) ("*Burlington N.*") (it is "well established that 'the major purpose of Congress in passing the Railway Labor Act was to provide a machinery to prevent strikes'") (quoting *Texas & N.O. R.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930)); *Int'l Ass'n of Machinists and Aerospace Workers v. NMB*, 425 F.2d 527, 533 (D.C. Cir. 1970) ("The major purpose of Congress is passing the [RLA] was 'to provide a machinery to prevent strikes' and the resulting interruptions to interstate commerce") (also quoting *Texas & N.O.*).

28

27     This goal of avoiding strikes and other interruptions to commerce is reflected in RLA

26 Section 2, First, which imposes a duty on a carrier's employees (and the unions that represent

25 them) to "exert every reasonable effort to make and maintain agreements concerning rates of pay,

24 rules, and working conditions, and to settle all disputes, whether arising out of such agreements or

23 otherwise, in order to avoid interruption to commerce or the operation of any carrier." 45 U.S.C.

22

21 § 152, First. This is "the heart" of the RLA, enforceable by injunctive relief where appropriate.

20 *Jacksonville Terminal*, 394 U.S. at 377-78. As numerous courts have observed, the RLA seeks

19 the "prompt and orderly settlement" of disputes and encourages collective bargaining in order to

18 prevent wasteful strikes and interruptions to interstate commerce. *See, e.g., United Air Lines, Inc.*

17 *v. Air Line Pilots Ass'n Int'l*, 563 F.3d 257, 273 (7th Cir. 2009); *United Air Lines, Inc. v. Int'l*

16 *Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 361 (7th Cir. 2001) ("*United v. IAM*");

15 *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir. 1986); *US*

14 *Airways, Inc. v. US Airline Pilots Ass'n*, 813 F. Supp. 2d 710, 730 (W.D.N.C. 2011).

13

12     To prevent disruptions to interstate commerce, Congress incorporated in the RLA distinct,

11 mandatory mechanisms for the resolution of the various types of disputes between carriers, their

10 employees, and the unions that represent those employees, as well as status quo obligations

9 attendant to each dispute resolution mechanism. *See, e.g.,* 45 U.S.C. §§ 152, Seventh, 155, First,

8 156, 160; *United v. IAM*, 243 F.3d at 361-62. Two such categories of disputes are referred to as

7 "major" and "minor." Contrary to the everyday meaning of those terms, the distinction between

6 these types of RLA disputes "does not turn on a case-by-case determination of the importance of

5 the issue presented or the likelihood it would prompt the exercise of economic self help."

4

3 *Consolidated Rail Corp. v. Ry. Labor Execs' Ass'n*, 491 U.S. 299, 305 (1989) ("*Conrail*").

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

2

Rather, major disputes are those that arise from the negotiation or renegotiation of collective bargaining agreements, while minor disputes involve the interpretation or application of such agreements. *Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe Ry. Co.*, 596 F.3d 1217, 1222 (10th Cir. 2010).

As explained by the Supreme Court, major disputes concern "the formation of collective agreements," and arise "where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Elgin, Joliet & E. Ry. v. Burley*, 325 U.S. 711, 723 (1945). Minor disputes, on the other hand, involve interpretation of an existing collective bargaining agreement, and relate to the "meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Id.*, 325 U.S. at 724. In short, the difference between the two is that "[m]ajor disputes seek to create contractual rights, minor disputes to enforce them." *Conrail*, 491 U.S. at 302.

In the major dispute context, the RLA "requires the parties to undergo a lengthy process of bargaining and mediation" before either party may resort to self-help. *Id.* at 302-03. The initial step is direct negotiations between the carrier and the union. If those negotiations do not result in an agreement, the dispute is referred to the NMB, which will render its services in an attempt to assist the parties in reaching agreement through mediated negotiation. 45 U.S.C. § 157, First. If the NMB's mediation efforts fail to result in an agreement, it offers binding interest arbitration to the parties. 45 U.S.C. § 155, First. If either or both of the parties declines the proffer of arbitration, the parties are released from mediation and a 30-day "cooling off" period ensues. *Id.*

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

The NMB's role in determining whether and when to release the parties into self-help is critical to the process of attempting to get the parties to reach agreement without disruptive strikes. *See Local 808 Bldg. Maint. Serv. and R.R. Workers v. NMB*, 888 F.2d 1428, 1438 (D.C. Cir. 1989) ("The power to hold the parties in mediation or, at any time, to proffer arbitration, is a coercive tool essential to bringing the parties to conciliation."). Absent the unusual case where the NMB has engaged in patent official bad faith, the decisions it makes in this regard are not even subject to judicial review. *See id.* at 1437 (the NMB's "choice to let a recalcitrant party sit until the pressure seriously to negotiate builds is . . . an essential tool of the process and profession, and it should not be disturbed by a court absent a clear showing of patent official bad faith.").

While the "almost interminable" major dispute processes are being exhausted, the parties are forbidden from altering the status quo or otherwise resorting to self-help. *Detroit & Toledo Shore Line R. R. v. United Transp. Union*, 396 U.S. 142, 149 (1969). *See also Conrail*, 491 U.S. at 302 ("In the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation" before engaging in any form of economic self-help such as a strike or other work stoppage.); *Burlington Northern R. Co. v. Bhd. of Maint. of Way Emps.*, 961 F.2d 86, 87 n.3 (5th Cir. 1992) ("parties may resort to self-help only after the procedures described in the [RLA] have been exhausted."). A union that threatens to strike before the major dispute process has been completed violates its duties under the RLA. 45 U.S.C. §§ 156, 155, First; *United v. IAM*, 243 F.3d at 361-62; *National Airlines, Inc. v. Int'l Ass'n of Machinists and Aerospace Workers*, 416 F.2d 998, 1000 (5th Cir. 1969) (quoting *Jacksonville Terminal*, 394 U.S. at 369). A carrier, therefore, may obtain a status quo injunction to prohibit union self-help during

GOODMAN LAW
GROUP
A Professional
Corporation
520 S. Fourth St, 2nd Fl,
Las Vegas, Nevada 89101
(702) 383-5088

- 16 -

the pendency of a major dispute. *See, e.g., Conrail*, 491 U.S. at 302; *Burlington Northern*, 961 F.2d at 87 n.3 ("strike by the union over a major dispute may also be enjoined prior to exhaustion of those procedures"); *National Airlines*, 416 F.2d at 1002-03 ("A strike called before the completion of the major dispute procedures, . . . is unlawful and may be enjoined pending compliance with the Act.").[11]

The employees' duty under Section 2, First applies even when the employer has no equivalent burden under that provision under the circumstances of a particular case. *Aircraft Mechs. Fraternal Ass'n v. Atl. Coast Airlines*, 125 F.3d 41, 44 (2d Cir. 1997) (union was obligated by Section 2, First to refrain from striking during first contract negotiations, even though carrier was free to make unilateral changes. *See also Nw. Airlines Corp. v. Ass'n of Flight Attendants – CWA*, 483 F.3d 160, 175 (2d Cir. 2007) (Section 2, First duties may not be reciprocal, in that "carriers and their employees may at times bear different, even unequal burdens, despite being subject to the same standard").

**B.    Defendants' Threatened Strike Violates the RLA**

Allegiant and IBT unquestionably are involved in a major dispute with respect to the negotiation of a collective bargaining agreement between them. It is equally undisputed that the major dispute procedures have not been exhausted such that the parties would be permitted to engage in self-help. Even IBT admits that it could not lawfully engage in a "major dispute" strike at this time. Harfst Dec. at ¶ 16, Ex. C. Allowing a strike under these circumstances would be at odds with the RLA's major dispute procedures and its overarching purpose of preventing interruptions

---

[11] Minor disputes, in contrast, are "subject to compulsory and binding arbitration." *Conrail*, 491 U.S. at 303; *Airline Prof'l Ass'n of the Int'l Bhd. of Teamsters, Local Union No. 1224 v. ABX Air, Inc.*, 274 F.3d 1023, 1028 (6th Cir. 2001); 45 U.S.C. § 184. Strikes over minor disputes are not permitted. *Conrail*, 491 U.S. at 304.

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101

- 17 -

to commerce, and thus could be enjoined. *See Consolidated Rail Corp. v. Bhd. of Maint. of Way Emps.*, 735 F. Supp. 1265, 1271 (E.D. Pa. 1990) ("It has been held many times under the [RLA] that economic action in support of bargaining demands prior to the exhaustion of the Act's major dispute procedures … is unlawful and enjoinable.").

Here, there is no question that the threatened strike it being directed and sponsored by the Defendants and that, unless enjoined, the Defendants will carry out the strike, causing irreparable injury to Allegiant, its other employees, and the flying public. In their communications to the pilots and Allegiant, Defendants have asserted that they are entitled to strike because Allegiant allegedly is in violation of the status quo with respect to its adoption of PBS in 2013. That argument is without merit.

First of all, Defendants' own communications show that they are seeking to strike because of their frustration with the major dispute process and to put economic pressure on Allegiant to come to an agreement on terms more favorable to IBT – and that "Plan B" is nothing more than an alternative to accomplish those goals if its "Plan A" of obtaining a release were to fail. The Defendants' March 10, 2015 communication refers to "two separate, parallel runways" leading to a strike, and they "would much rather to be able to negotiate a consensual agreement with the company" than "roll down" either path. Baden Dec. at ¶ 4, Ex. A. Defendants then stated that reaching a consensual agreement "requires good faith by the company and a desire to work with us to reach a fair agreement," and because they did not believe that Allegiant's management had "any interest or desire in working with us in good faith," the pilots "need to be ready to roll." *Id.*

Likewise, in a subsequent communication to the pilots, the Defendants asserted that it was "unrealistic to expect our executives to suddenly agree to a new contract when they won't honor

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

- 18 -

the old one," and that a strike would be pursued "sooner than later" because Defendants were concerned that "management seeks more time to strengthen their position by wearing down labor." Baden Dec. at ¶ 5, Ex. B. The Defendants also acknowledged that if the NMB declined to release the parties and the Ninth Circuit reversed the preliminary injunction order, that "would leave us with zero strike options for the foreseeable future." *Id.*[12] The following statement from that communication leaves no doubt that a "Plan B" strike was designed to change Allegiant's behavior at the bargaining table:

> Management recognizes that attrition and time are our worst enemy. This is precisely why negotiations have gone nowhere in two-and-a-half years. A status quo strike not only strengthens our position and credibility, it will likely shorten, or even remove all together any appetite on management's part for an NMB strike. The overwhelming message we are getting from our pilots is loud and clear – strike at the earliest opportunity to right the wrongs the company is trying to get away with here.

*Id.*

These statements leave no doubt that the Defendants' strategy is to strike to put economic pressure on Allegiant to affect its conduct at the bargaining table – exactly what the major dispute processes are designed to prevent. Whether and when the Defendants should be permitted to do that is solely up to the NMB, based on its assessment of the parties' conduct and positions, and the impact that a release would have on interstate commerce. To date, the NMB has not seen fit to grant the IBT's request for a proffer. That does not give Defendants the right to circumvent or opt out of the major dispute process through the façade of a "Plan B" strike that purportedly is based on alleged status quo violations.

---

[12] The Ninth Circuit would not have to reverse the PI Order in its entirety for IBT to lose any ability to strike under its "status quo" theory. Even were the Ninth Circuit to conclude that the PWR created a status quo obligation generally, it could find that the specific issues about which IBT complained were minor disputes, not major disputes, and thus not violations of the status quo. It is telling that IBT is racing to strike before the Ninth Circuit renders its decision.

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ⁿᵈ FL.,
LAS VEGAS, NEVADA 89101
(702) 383-5088

Defendants' "Plan B" strategy suffers from an additional, fatal flaw – the Defendants already have obtained relief from the alleged status quo violations through its court proceeding.[13] Although the Court found that the adoption of PBS in lieu of line bidding was a change in the status quo, it recognized that a return to the line bidding system mandated by the PWR was not practicable because that "would cause major disruptions to Allegiant's flight operations because that system was designed before Part 117 went into effect." PI Order, p. 21.[14] The Court further observed that there was a public interest in Allegiant's continued operations as a common carrier and that the "underlying thrust" of the RLA was to keep common carriers in business during labor disputes. *Id.* These considerations, the Court found, justified a "narrowly-tailored injunction, especially as to pilot scheduling and possible impacts on Allegiant's flight operations." *Id.*

IBT itself told the Court that it was abandoning the idea of an order compelling a return to a pre-Merlot line bidding system – and thus can hardly be heard now to complain that Allegiant's failure to return to line bidding is a violation of status quo. *See* Reporter's June 5, 2014 Transcript of Motion for Preliminary Injunction ("Tr."), p. 761, line 18 – p. 765, line 17.[15]

---

[13] Allegiant is unaware of anything they have done since the entry of the PI Order that Defendants argue are "new" status quo violations, justifying their position that have the right to strike. If that is Defendants' contention, those matters would have to be analyzed carefully to determine whether they are in fact "minor disputes" that turn on interpretation of the PWR – as the Court found was the case with one of the issues raised by IBT in its preliminary injunction motion. *See* PI Order, pp. 14-15. "When a dispute is minor, the parties have no duty to maintain the status quo." *Ass'n of Flight Attendants v. Mesa Air Group, Inc.*, 567 F.3d 1043, 1047 (9th Cir. 2009). A carrier need only show that its position that the agreement permitted them to make the change in question was "arguably justified" to render it a minor dispute – a "relatively light" burden. *Id.*

[14] The impossibility of returning to line bidding easily or quickly, without significant disruption to Allegiant's operations, was due in large part to IBT's delay in moving the Court to enjoin the switch to PBS until after the system was purchased, implemented, and in use. Allegiant announced the adoption of PBS in May 2013, and that it would go into effect when Part 117 did in January 2014, but it was not until June 2014 that a hearing ultimately was held on IBT's preliminary injunction motion.

[15] Relevant portions of the transcript are attached at Tab 6.

211

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL,
LAS VEGAS, NEVADA 89101

- 20 -

Specifically, counsel for IBT told the Court that IBT "want[s] something that works for the pilots and that will also work for the company" and that the solution would be to find "a way to construct this without – without harming their ability to – obviously comply with [FAR] Part 117 and without having to go off and buy another, you know, whole product." The Court clearly took that position into account in formulating its "narrowly tailored" injunction that, instead of ordering a return to line bidding, directed that changes be made to PBS to address the pilots' concerns about the new system.

Although a union may be entitled to strike in response to a carrier's breach of the status quo, the point of such self-help is to obtain restoration of the status quo, not to "punish" the carrier generally or to affect the parties' negotiations in particular. Thus, a union's "status quo" strike may be enjoined after the carrier has complied with an injunction to restore it. In *National Airlines*, the court noted that a union's right to strike terminates when the carrier has complied with the RLA:

> [I]t is conceivable that the strike at the time of the first hearing was lawful. The Union, however, did not contest the initial strike injunction. In any event, the Carrier promptly complied with the January 18 temporary restraining order, issued contemporaneously with the strike injunction, and was thereafter in compliance with the Act.   The strike, however, continued and was, therefore, even under the *Galveston Wharves* rationale, in violation of the Act and properly enjoinable from that point forward, if not before.

*National Airlines*, 416 F.2d at 1003 n. 4. *See also Atlanta & W. Point R.R. Co. v. United Transp. Union*, 439 F.2d 73, 80 (5th Cir. 1971).

Here, IBT sought and obtained judicial relief with respect to the alleged status quo violations by Allegiant, including with respect to the adoption of PBS. Allegiant has since complied with the PI Order and observed the PWR as the status quo between the parties while

211

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
320 S. FOURTH ST., 2ND FL.,
LAS VEGAS, NEVADA 89101

28

27   they negotiate, and thus is in compliance with the RLA. The fact that the Court declined to order

26   a return to line bidding, which it felt was part of the status quo, does not mean that IBT therefore

25   has the right to strike. On the contrary, permitting IBT to strike based on alleged status quo

24   violations that the Court determined should not be judicially restored would violate both the spirit

23   and the language of the PI Order – especially given IBT's own position on such relief before the

22
     Court. *See* Tab 6.
21

20        The Court carefully considered the impact that ordering a return to line bidding would

19   have on Allegiant's continued operations as a common carrier and on the "underlying thrust" of

18   the RLA to keep airlines in business during labor disputes. PI Order, p. 21. Having engaged in

17   that analysis in determining the parameters of the "narrowly-tailored" injunction it ordered, it is

16   extremely unlikely that the Court envisioned that its order would permit IBT to disrupt

15   Allegiant's operations through a strike while it engaged in the major dispute process with IBT.

14
     IBT's strike is not lawful under the RLA and should be enjoined.
13

12   **II.    ALLEGIANT IS ENTITLED TO INJUNCTIVE RELIEF**

11        **A.    Allegiant Satisfies the Preliminary Injunction Criteria**

10        The test that a court generally is to apply when faced with a request for a preliminary

9    injunction is a familiar one. The moving party "must establish that he is likely to succeed on the

8    merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

7
     balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*
6
     *NRDC, Inc.*, 555 U.S. 7, 20 (2008). Those prerequisites are met here.
5

4        First, as demonstrated at length above, Allegiant has a substantial likelihood of success on

3    the merits of its claim that the Defendants' threatened strike is unlawful under the RLA. The

211
GOODMAN LAW
    GROUP
A PROFESSIONAL   2
  CORPORATION
320 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
   (702) 383-5088

RLA simply does not permit a job action in support of a dispute over negotiation of changes in rates of pay, rules, or working conditions without exhausting the major dispute procedures, and IBT's "status quo" theory ignores that it already sought and obtained restoration of the status quo, to the extent that the Court felt that was appropriate.

Allegiant would suffer irreparable injury in the absence of preliminary injunctive relief. Even a one-day strike could cost the company in excess of $7.7 million in lost revenue, fare refunds, vouchers to displaced/inconvenienced passengers, and other disruption expenses. Harfst Dec. at ¶ 28. Moreover, IBT has timed its threatened strike for Easter weekend, one of Allegiant's busiest travel seasons. Allegiant is scheduled to transport over 71,000 passengers on Easter Sunday and the day after alone. If the pilots struck, most of these passengers would have no realistic option to get to their destination, given that Allegiant is the only direct scheduled service option on most of the routes it flies, and given the unlikelihood that they could find last-minute tickets on other carriers during this busy weekend. Passengers whose flights are cancelled certainly would be less likely to fly with Allegiant in the future, damaging its goodwill with its customers (and also the airports to which Allegiant flies). *Id.* Such potential harm has been found sufficient to satisfy the irreparable injury prong. *See, e.g., Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm"); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("the threat of a permanent loss of customers and the potential loss of goodwill also support a finding of irreparable harm"); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1308 n.18 (11th Cir. 2001) (lost revenue and goodwill). *See also Consolidated Rail Corp. v. United*

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101

*Transp. Union*, 1995 WL 428700, at *3 10134 (E.D. Pa. July 17, 1995) (citing the "immediate and possibly permanent loss of customers" should Conrail's schedule be interrupted by a strike as establishing irreparable harm for RLA injunction), *aff'd without op.*, 91 F.3d 123 (3rd Cir. 1996).[16]

Granting injunctive relief would not result in any harm to the Defendants, and certainly not more harm than that which Allegiant would suffer absent an injunction, as they only will be prevented from engaging in activity that the RLA makes unlawful. *See Consolidated Rail Corp. v. Bhd. of Maint. of Way Emps.*, 735 F. Supp. at 1272 ("maintenance of the status quo until exhaustion of the procedures mandated by the Act, comports with the language and policy of the Act"). Moreover, "the Ninth Circuit uses a sliding scale approach, where the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset the weaker showing of another." *FTC v. Loewen*, 2012 WL 4045207, at *3 (W.D. Wash. Sept. 13, 2012) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2010)). Under this sliding-scale approach, "a preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits are raised and that the balance of hardships tips sharply in the plaintiff's favor." *Loewen*, 2012 WL 4045207, at *3. Allegiant has met that test as well.

Finally, the public interest favors injunctive relief as an injunction would ensure the uninterrupted operations of Allegiant, thus avoiding the very disruption to interstate commerce

---

[16] That the job action has only been threatened to date does not diminish the Court's authority to enjoin it. Courts, including the Supreme Court, have issued or upheld injunctions against threatened job actions that would violate the RLA. *See, e.g. Bhd. of R.R. Trainmen v. Chicago River & I.R. Co.*, 353 U.S. 30, 32 (1957); *R.R. Yardmasters v. Pennsylvania R. Co.*, 224 F.2d 226, 228 (3rd Cir. 1955); *Consolidated Rail Corp. v. Bhd. of Maint. of Way Emps.*, 735 F. Supp. at 1271-72. *Cf. Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 254 (1970) (enjoining threatened strike under NLRA).

211
GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.,
LAS VEGAS, NEVADA 89101

that the RLA is designed to prevent. *See, e.g., Consolidated Rail Corp. v. Bhd. of Maint. of Way Emps.*, 781 F. Supp. 360, 372 (E.D. Pa. 1991) (citing the impact on other railroads of a work stoppage on Conrail as supporting injunctive relief under RLA); *Delta*, 238 F.3d at 1308 n.18 (injunction would further public interest by insuring continued air travel). In this case the interruption of travel by Allegiant's customers and the ensuing inconvenience and expense to them is manifest. Indeed, because of the "public interest in peaceful settlement of labor disputes through utilization of statutory procedures" some courts have held that irreparable injury need not be shown in cases involving violations of the RLA. *Southern R. Co. v. Bhd. of Locomotive Firemen and Enginemen*, 337 F.2d 127, 134 (D.C. Cir. 1964).

**B.**     **The Norris-LaGuardia Act Does Not Bar Issuance of an Injunction**

Although Section 4 of the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 104 (2014), generally prohibits the issuance of injunctions in labor disputes, that "limitation on district courts' power to issue injunctions in labor disputes must be accommodated to the more specific provisions of the RLA." *Pittsburgh & L.E. R. Co. v. Railway Labor Execs. Ass'n*, 491 U.S. 490, 513 (1989). "'[T]he District Court has jurisdiction and power to issue necessary injunctive orders' to enforce compliance with the requirements of the RLA 'notwithstanding the provisions of the Norris-LaGuardia Act.'" *Id.* (quoting *Bhd. of R. Trainmen v. Howard*, 343 U.S. 768, 774 (1952)). *See also Chicago River & I.R. Co.*, 353 U.S. at 41-42 ("[T]he specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act."); *Railroad Yardmasters of Am. v. Pennsylvania R. Co.*, 224 F.2d 226, 228 (3rd Cir. 1995) (where violation of the RLA would occur, NLGA prohibition against issuing injunctions in labor dispute is not applicable).

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

- 25 -

The NLGA does not bar injunctive relief against the Defendants' threatened violation of their duty under RLA Section 2, First, or of their efforts to exercise self-help prior to the exhaustion of the major dispute process. *See, e.g., Chicago River*, 353 U.S. at 42 (district court has "jurisdiction and power to issue necessary injunctive orders" to enjoin strikes that were deemed illegal under the RLA) (internal quotes omitted); *Burlington N.*, 286 F.3d at 808-09 (affirming injunction, notwithstanding NLGA); *United v. IAM*, 243 F.3d at 363-70 (issuing injunction over IAM's numerous arguments predicated upon NLGA); *Delta*, 238 F.3d at 1307 (enjoining self-help by pilots (restriction on overtime flying) because Section 2, First is a "specific provision" of the RLA that "takes precedence over . . . the NLGA."); *Chicago & N.W. Transp. Co v. Railway Labor Execs' Ass'n*, 908 F.2d 144, 157 (7th Cir. 1990) (enjoining strike over minor dispute: "injunctions to enforce the Railway Labor Act do not violate the Norris-LaGuardia Act").

Section 8 of the NLGA, 29 U.S.C. § 108, provides that injunctive relief will not be granted to any party who has failed to comply with a legal obligation involved in the labor dispute in question or who has failed to make every reasonable effort to settle the dispute either through negotiation or with the aid of governmental mediation. It would not operate to bar Allegiant from obtaining injunctive relief here. Allegiant has litigated at length with IBT over the extent to which it has a status quo obligation during the parties' negotiations (including seeking clarification from the Court about the scope of its order) and it has complied with the Court's PI Order while it appeals that decision. Thus, Allegiant has met its legal obligations. Allegiant is engaged in mediation under the auspices of the NMB, and the NMB has thus far indicated that continued meetings may be useful in bringing the parties to the table. Finally, upon learning of

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ⁿᴰ FL.
LAS VEGAS, NEVADA 89101
(702) 385-5088

- 26 -

the threatened strike, Allegiant met with IBT to discuss potential resolution of what IBT felt were the "status quo" violations. All of this is sufficient to meet any obligation that Allegiant may have under Section 8. *See, e.g., Grand Trunk W. R.R., Inc. v. Bhd. of Maint. of Way Emps. Div.*, 497 F.3d 568 (6th Cir. 2007); *Northwest Airlines*, 483 F.3d at 177; *Atlanta & W. Point R.*, 439 F.2d at 80.

## CONCLUSION

Allegiant and IBT have not completed the RLA's major dispute resolution procedures. Unless and until those procedures are completed without a new collective bargaining agreement having been reached, it cannot strike or otherwise disrupt Allegiant's operation. In clear contravention of their legal obligations, the Defendants have threatened to engage in unlawful self-help. That strike, and Defendants' efforts in support thereof, should be enjoined.

WHEREFORE, for the reasons set forth herein and in the papers filed concurrently herewith, Allegiant respectfully requests that this Court hear this matter and issue a temporary restraining order, followed by a preliminary injunction in the form proposed by Plaintiff.

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL,
LAS VEGAS, NEVADA 89101
(702) 383-5088

Dated:  April 1, 2015

Respectfully Submitted,

*/s/  Ross C. Goodman, Esq.*
Ross C. Goodman, Esq.
Nevada Bar No. 7722
GOODMAN LAW GROUP
A Professional Corporation
520 S. Fourth Street, Second Floor
Las Vegas, Nevada 89101
Telephone: (702) 383-5088
Facsimile: (702) 385-5088
Email:  ross@goodmanlawgroup.com
*Attorney for Plaintiff*

Douglas W. Hall, Esq.
FORD & HARRISON LLP
1300 19th Street NW, Ste. 300
Washington, DC 20036
Telephone: (202) 719-2065
Facsimile: (202 719-2077
Email:  dhall@fordharrison.com
*Attorney for Plaintiff (Pro Hac Vice Pending)*

Andrew D. McClintock, Esq.
FORD & HARRISON, LLP
271 17th Street NW, Ste. 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3830
Facsimile: (404) 888-3863
Email:  amcclintock@fordharrison.com
*Attorney for Plaintiff (Pro Hac Vice Pending)*

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the forgoing has been served via the Court's CM/ECF system on April 1, 2015.

/s/ Ross C. Goodman, Esq.
Ross C. Goodman, Esq.

GOODMAN LAW
GROUP
A PROFESSIONAL
CORPORATION
520 S. FOURTH ST, 2ND FL.
LAS VEGAS, NEVADA 89101
(702) 383-5088