# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| ALLEGIANT AIR, LLC, | Case No. 2:15-CV-00580-APG-GWF |
| Plaintiff, | |
| v. | **PRELIMINARY INJUNCTION** |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION, et al., | (Dkt. #11) |
| Defendants. | |

Plaintiff Allegiant Air, LLC seeks an injunction to stop its pilots, represented here by defendant International Brotherhood of Teamsters, from going on strike. Allegiant and Teamsters have been in mediated negotiations through the National Mediation Board since April 2014, and Allegiant argues that allowing the pilots to strike now, before those dispute resolution procedures have been exhausted,[1] would violate the Railway Labor Act. Teamsters responds that a strike would not violate the Act, because the strike is simply designed to get Allegiant to restore the status quo—and status quo strikes are lawful under the Act. Teamsters further argues that Allegiant is not entitled to an injunction because the airline does not have "clean hands."

The parties' briefs focus on three potential status quo violations: (1) whether Allegiant has violated the Loss-of-Medical-Certificate program, (2) whether Allegiant consulted with the pilots on modifications to its monthly pilot scheduling system, and (3) whether Allegiant's scheduling system violates an order I issued in a related case: *Int'l Bhd. of Teamsters, Airlines Div. v. Allegiant Air, LLC*, No. 2:14-CV-00043-APG-GWF ("*Allegiant I*"). Aided by testimony from both parties during a three-day evidentiary hearing, I now grant Allegiant's motion for a

---

[1] Teamsters have requested that the National Mediation Board release the parties from mediation and proffer arbitration. But the Board has declined to rule on that request and instead directed the parties to return to the bargaining table. (Dkt. #11 at 3.)

preliminary injunction, finding that it has not violated the status quo established by my July 22, 2014 order.  As a result, it would be unlawful for the pilots to strike.

## I.       BACKGROUND

On July 22, 2014, after an extensive evidentiary hearing in *Allegiant I*, I ordered Allegiant to restore the status quo created by the Pilot Work Rules, which is a set of policies and practices I found constituted a collective bargaining agreement between Allegiant and the pilots.[2]  I did, however, allow Allegiant to continue to use a new Preferential Bidding System ("PBS") to schedule its pilots, even though I found that system to be a status quo violation.  Under the Pilot Work Rules, scheduling had been done through a system known as "line bidding."[3]  I allowed Allegiant to use PBS because Allegiant convinced me that switching back to line bidding would be prohibitively disruptive.[4]

The pilots had several complaints about Allegiant's new scheduling system.  So in my order, I required Allegiant to modify this system "to better respect pilot seniority and to provide greater transparency and predictability for the pilots."[5]  I also required the parties to submit status reports every 30 days on the progress of these modifications.[6]

Since the entry of my July order, Allegiant has modified its monthly scheduling system, particularly with regard to the interface the pilots use to create their bids.  The pilots contend that they were not timely or sufficiently consulted about these changes as required by my July order. They also contend that Allegiant remains in violation of the Loss-of-Medical-Certificate program.

---

[2] (*See* Dkt. #79 in *Allegiant I*.)

[3] Under a line bidding system, the most senior pilot's schedule is completely filled out before the second most senior pilot's schedule, which is then completely filled out before the third most senior pilot's—and so on, until all the work slots are filled.

[4] "It appears that a return to the line bidding system mandated by the [Pilot Work Rules] would cause major disruptions to Allegiant's flight operations….[Teamsters are] entitled to a limited injunction regarding pilot scheduling, but I will not order a wholesale return to line bidding under the [Pilot Work Rules]." (*Id.* at 12.)

[5] (*Id.* at 23.)

[6] (*Id.*)

1    Teamsters threatened to strike, so Allegiant filed this lawsuit seeking an injunction

2 preventing that strike.  Chief Judge Navarro issued a Temporary Restraining Order blocking the

3 strike, the case was transferred to me, and I held a three-day evidentiary hearing on Allegiant's

4 motion for a preliminary injunction.

5    Teamsters contends that Allegiant's progress has been contemptibly inadequate,[7] and at

6 the evidentiary hearing, several pilots testified to their frustrations.  One pilot testified that while

7 his bids to have both Christmas and Easter off were rejected, a more junior pilot was given those

8 days off.[8]  Other pilots testified that the new system makes it very difficult for pilots to reliably

9 predict their schedules and that no other airline uses a system like it.[9]  Pilots also testified that

10 they proposed modifications to the Allegiant scheduling system that are more in line with the

11 importance my order placed on honoring seniority and improving transparency and predictably.[10]

12    Allegiant painted a very different picture.  It presented evidence that the modifications

13 proposed by the pilots would not work given Allegiant's position as a niche airline that serves

14 smaller markets that few if any other carriers fly to, including Wendover, Nevada; Bangor,

15 Maine; Ogden, Utah; and Grand Forks, North Dakota.[11]

16    With regard to the present motion for an injunction, the main point of contention between

17 Allegiant and Teamsters is how the airline prioritizes scheduling "Must-Fly Days,"[12] which are

18 days when all pilots at a particular base airport must fly regardless of their seniority.  Allegiant's

19 monthly scheduling system first fills all work slots on all Must-Fly Days based on seniority; it

20 then fills the remaining work slots for the month by the pilots' preferences based on seniority.  A

21 more senior pilot may not have all of her preferences granted if a choice would result in a flight

22

23    [7] Teamsters has filed a motion for contempt sanctions. (*See* Dkt. #131 *in Allegiant I*.)

24    [8] (*See* Dkt. #31 at 676-683.)

25    [9] (*Id*. at 563.)

26    [10] (*Id*. at 634-38.)

   [11] (*See* Dkt. #32 at 309-310; Dkt. #31 at 662, 703)

27    [12] The terms "Must-Fly Days," "Must-Work Days," and "Max-Fly Days" were used
28 interchangeably throughout the hearing.

that violates FAA regulations or other rules; thus, seniority is not completely honored under Allegiant's system. The pilots contend that if the system is modified so that it does not first satisfy all Must-Fly Day flights but instead fills out the pilots' schedules based solely on seniority ("horizontally" as they term it), then seniority will be honored and all Must-Fly Day flights will be filled.

Allegiant witnesses also testified about efforts they have made both to get feedback from the pilots on the new system and to teach them how best to use it. Among these efforts were "road shows," in which Allegiant representatives familiar with the system put on demonstrations at base airports so that pilots could learn more about how it works and ask questions.[13] Allegiant maintains that these and other educational efforts, many of which follow the specific directives in my July order,[14] are the principal ways in which it sought to better honor seniority and improve transparency and predictability.[15] In fact, since my July order, no changes were made to the actual software and algorithm on which the new scheduling system operates, though Allegiant did introduce a new interface called CBI that, according to its witnesses, makes it easier for pilots to bid their preferences and more likely that they will receive them.[16] One Allegiant witness supported this claim by testifying that during the last bid period, with CBI fully operational at one base airport, most pilot preferences at that base were honored.[17] Nevertheless, Allegiant offered to stop using CBI if that would keep the pilots from striking.[18]

They also agreed to provide back wages to a pilot who, as a result of an injury, has been unable to fly.[19] This pilot's situation came up in the context of Teamsters' claim that Allegiant has not complied with the part of my July order that directed Allegiant to restore its Loss-of-

---

[13] (*See* Dkt. #32 at 241-47.)

[14] (*See* Dkt. #79 at 23-24.)

[15] (*See* Dkt. #32 at 306-309.)

[16] (*See* Dkt. #26 at 105, 107-108, 110-113; Dkt. #32 at 309.)

[17] (*See* Dkt. #32 at 126-130; *see also* Hearing Exhibit #2.)

[18] (*See* Dkt. #26 at 33-34, 54-56).

[19] (*Id*. at 56.)

1    Medical-Certificate Program, a program designed to give disabled pilots "light duty" work until

2    they are once again cleared to fly. As I explained during the hearing, the parties' current

3    disagreement over that program—whether Allegiant can assign a pilot light duty work at her base

4    airport if that base is far away from her home—is a "minor" dispute under the Railway Labor

5    Act, and thus cannot be the basis for a strike.[20] My analysis focuses on the only remaining

6    "major dispute": whether Allegiant's scheduling system violates the status quo established by my

7    July order.

8    **II.    Railway Labor Act and Norris-LaGuardia Act: Preliminary Injunction**

9            One of the express purposes of the Railway Labor Act—which despite its name also

10    applies to airlines—is to "avoid any interruption to commerce or to operation of any carrier

11    engaged therein."[21] The Act lays out guidelines that must be followed for parties negotiating

12    labor contracts, including severe restrictions on strikes. "It has been held many times under the

13    Railway Labor Act that economic action in support of bargaining demands prior to exhaustion of

14    the Act's major dispute procedures under Sections 5 and 6 is unlawful and enjoinable."[22] In other

15    words, the pilots are prohibited from striking as a way to gain leverage over Allegiant during

16    negotiations under the direction of the National Mediation Board.[23]

---

[20] (*See* Dkt. #26 at 9-11 (citing *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n,* 491 U.S. 299, 303-304 (1989).)

[21] 45 U.S.C. § 151a.

[22] *Consol. Rail Corp. v. Bhd. of Maint. of Way Emps*, 735 F. Supp. 1265, 1271 (E.D. Pa. 1990) (citing *Ry. Labor Executives' Ass'n*, 491 U.S. at 302).

[23] *See Burlington N.R. Co. v. Maint. of Way Emps.*, 481 U.S. 429, 444 (1987) (explaining that "the [Railway Labor Act] requires all parties both to exert every reasonable effort to make and maintain collectively bargained agreements and to abide by the terms of the most recent collective-bargaining agreement until all the settlement procedures provided by the [the Act] have been exhausted") (internal quotations omitted)); *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Exp. & Stations Emps. v. Florida E. Coast. R. Co.*, 384 U.S. 238, 246 (1966) ("For the procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute.").

1    The pilots can strike, however, if Allegiant has violated the "status quo."[24]  Much debate

2    in this case focuses on what constitutes the status quo by which Allegiant's actions must be

3    measured.  Allegiant argues that the status quo must be measured by the Pilot Work Rules.[25]  But

4    it would be unfair to hold Allegiant to that standard given that my July order modified the Pilot

5    Work Rules to allow Allegiant to move forward with its new scheduling system.  Accordingly,

6    the status quo by which I must determine whether the pilots' strike violates the Railway Labor

7    Act is the Pilot Work Rules as modified by my July order.

8    Yet even if the pilots' strike violates the Railway Labor Act, Allegiant cannot obtain an

9    injunction to stop the strike if it does not have "clean hands."  This requirement comes from

10   Section 8 of the Norris-LaGuardia Act.[26]  Because no part of the Railway Labor Act conflicts

---

[24] *See, e.g., Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 154 (1969) ("If the [carrier] is free at this stage to take advantage of the agreement's silence and resort to self-help, the union cannot be expected to hold back on its own economic weapons including the strike."); *Atlanta & W. Point R.R. Co. v. United Transp. Union*, 439 F.2d 73, 80 (5th Cir. 1971) ("[T]he union had the right to strike; that right continues until the Act is complied with by the Carrier.") (quotation omitted).

[25] (*See* Dkt. #31 at 588.)

[26] "No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108.  At the hearing, I made a preliminary finding that Allegiant had satisfied the "reasonable effort" part of this test, noting that the law requires Allegiant to make every reasonable effort, not every conceivable one. (Dkt. #26 at 15-16 (citing *Bhd of Maint. of Way Emps v. Union Pacific*, 358 F.3d 453, 458 (7th Cir. 2004).)  I adopt that as an official finding now.  Allegiant has engaged in mediation through the National Mediation Board to try to end the dispute.  When conflicts have arisen, it has sought my clarification. (*See Allegiant I* Dkt. ##111, 117.)  And in the days leading up to the planned strike, it reached out to the pilots to see if some agreement could be arranged. (*See* Dkt. #31 at 453-456; *see also* Hearing Exhs. #9-12.)  These steps are enough to satisfy the "reasonable effort" standard.  *See United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 364-65 (7th Cir. 2001).

As for the first part of the clean hands test, the part that would prevent Allegiant from getting an injunction if it had "failed to comply with any obligation imposed by law which is in involved in the labor dispute," my analysis is the same as my analysis of whether Allegiant has violated the status quo, which appears below.  The only "obligation imposed by law" Allegiant allegedly has not complied with is my July order. (*See* Dkt. #26 at 15.)

1   with Section 8, I must apply both statutes.[27]  "[T]he competing demands of the [Railway Labor

2   Act] and the Norris-LaGuardia Act" must be "accommodate[d]."[28]

3        In determining whether to enter an injunction, I also must consider the factors under

4   Federal Rule of Civil Procedure 65: (1) the likelihood of success on the merits, (2) the likelihood

5   of irreparable harm, (3) whether the balance of the equities tip in Allegiant's favor, and (4)

6   whether an injunction is in the public's interest.[29]  The analysis of these four factors includes the

7   factual findings I must make under section 7 of the Norris-LaGuardia Act.[30]

8        A.  **Likelihood of Success on the Merits**

9        During the evidentiary hearing, Allegiant's witnesses testified about the many steps the

10  airline has taken to comply with my July order.  For example, during the road shows,

11  representatives from Allegiant put on demonstrations of the scheduling system and paused the

12  system at times so that pilots could see "the exact logic of how the Must-[Fly] days are solved

13  for."[31]  Allegiant provided one-on-one guidance to the pilots as they tried to better understand the

14  new bidding process,[32] it set up "Crew Days" so pilots could question Allegiant personnel about

15  the process,[33] and Allegiant then used these questions and other feedback from the pilots to add a

16  wider selection of bidding options as well as a new tool—CBI—to make the bidding process

17  more transparent and reliable.[34]

18       On the other hand, the pilots expressed understandable frustration with the new scheduling

19  system, particularly given that, in their view, Allegiant misrepresented the need for it in the prior

20  hearing that led to my July order.  But as I explained many times during this more recent hearing,

21

22  ───────────────

    [27] *Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of Teamsters*, 779 F.3d 1069, 1077 (9th Cir. 2015).

23  [28] *Burlington*, 481 U.S. at 445.

24  [29] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

25  [30] 29 U.S.C. § 107.

    [31] (*See* Dkt. #32 at 241, 251, 274.)

26  [32] (*Id*. at 242, 340-341.)

27  [33] (*Id*. at 242, 248-251.)

28  [34] (*See* Dkt. #32 at 245-246, 267, 283-284; *see also* Hearing Exh. 14O.)

1  the issue presently before me is solely whether Allegiant violated the status quo established by

2  my July order.[35]  When pressed, Teamsters struggled to identify specific violations.  Nor could

3  Teamsters identify what would have to happen for me to find that status quo had been

4  reinstated.[36]  Instead, Teamsters' witnesses focused on how the new scheduling system was worse

5  than the line bidding system that was in place before my July order.  Captain Dan Wells, for

6  instance, identified line bidding as the status quo that needs to be restored,[37] and a press release

7  from Teamsters announcing the pilots' plan to strike shows that the strike was motivated by a

8  desire to have Allegiant "reestablish a prior scheduling system."[38]

9          I understand that the pilots are unhappy with the new scheduling system.  But based on the

10  evidence presented at the evidentiary hearing, I cannot find that Allegiant has, since July, violated

11  the status quo established by my order.  Allegiant has tried to teach pilots how to better take

12  advantage of the system's built-in protections of seniority.  It has developed, with input from the

13  pilots, a new interface to make the bidding process more transparent and predictable.  And when

14  potential violations were identified, it sought my clarification to make sure it was complying with

15  what my July order had directed.[39]  Such actions may not lead to a perfect scheduling system, nor

16  certainly to one the pilots would design themselves.  But they also do not rise to the level of status

17  quo violations.  Accordingly, it would be unlawful for the pilots to strike at this point, which

18  means Allegiant is likely to win on the merits of its arguments.  This factor therefore favors

19  Allegiant.

20  / / / /

21

22          [35] (*See* Dkt. #26 at 16-18, 25-27; Dkt. #32 at 231.)  Teamsters contends Allegiant misled me in its
     papers and in the testimony of its witnesses that led to my July order.  Teamsters also contends that the
23  Allegiant scheduling system can be easily modified to better comply with the Pilot Work Rules and my
     July order.  I will hold a separate hearing in the *Allegiant I* case to determine whether these contentions are
24  true.

25          [36] *Atlanta & W. Point R.R. Co.*, 439 F.2d at 80 ("'[T]he union had the right to strike; that right
     continues until the Act is complied with by the Carrier.") (quotation omitted).

26          [37] (*See* Dkt. #31 at 588.)

27          [38] (*See* Hearing Exh. 17.)

28          [39] (*See* Dkt. #26 at 20-21; *see also* Dkt. ##111, 117 in *Allegiant I*.)

**B.  Likelihood of Irreparable Harm**

Allegiant argues that it would suffer irreparable harm if the pilots were allowed to go on strike, and because "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm,"[40] I agree.  Even a one-day strike "could cost the company in excess of $7.7 million in lost revenue, fare refunds, vouchers to displaced/inconvenienced passengers, and other disruption expenses."[41]  More than that, however, is the potential harm to Allegiant's reputation.  Cancelled flights lead to unhappy customers, particularly where alternative options are not readily available.  This can easily happen with Allegiant because, given the small markets it services, there are not always substitute flights. This factor therefore favors Allegiant.

**C.  Balance of the Equities**

To balance the equities, I must weigh "the competing claims of injury and [] consider the effect on each party of the granting or withholding of the requested relief."[42]  The potential harm to Allegiant is significant.  If the pilots are allowed to strike, Allegiant would potentially lose millions of dollars and would have a hard time recovering from the blow to its reputation that a large number of cancelled flights would cause.  The potential harm to the pilots, on the other hand, is negligible.  Given that Allegiant has not violated the status quo, enjoining the pilots from striking simply means enjoining them from taking an action that is illegal under the Railway Labor Act.

This conclusion is not meant to diminish the obvious frustration the pilots have experienced dealing with a scheduling system they believe undervalues their interests and input, frustrations that clearly reflect a more general feeling of being consistently mistreated by Allegiant.  But on the narrow issue before me, the balance of the equities favors Allegiant.

/ / / /

---

[40] *Stuhlberg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001).

[41] (Dkt. #11 at 23.)

[42] *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987).

1

### D.  Public Interest

"The public interest analysis for the issuance of a preliminary injunction requires [courts] to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief."[43]  Given the disruption to the public that an airline strike can cause (especially where Allegiant may be the only airline servicing many of its markets), granting Allegiant an injunction would not injure any critical public interest.  Rather, an injunction would further the public interest by insuring that air travel on a major carrier could continue.[44]  This factor favors Allegiant.

### III.    Conclusion

IT IS HEREBY ORDERED that Defendants, their officers, agents, employees, and members, and all persons acting in concert or participation with them, are hereby enjoined from in any manner or by any means directing, calling, causing, authorizing, inducing, instigating, conducting, continuing, encouraging, or engaging in any strike, work stoppage, picketing, sick-out, slow-down, work-to-rule campaign, or other concerted action that is intended to interfere with Allegiant's normal operations in violation of the Railway Labor Act.

IT IS FURTHER ORDERED that Defendants, their officers, agents, employees, and members, and all persons acting in concert or participation with them, shall immediately take all reasonable steps within their power to prevent the aforesaid actions and to refrain from continuing the aforesaid actions, if commenced.

IT IS FURTHER ORDERED that the ten thousand dollar ($10,000) bond posted by Allegiant as security for the Temporary Restraining Order shall serve as security for this Preliminary

/ / / /

/ / / /

---

[43] *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011).

[44] *See Delta Air Lines, Inc. v. Airline Pilot's Ass'n Int'l*, 238 F.3d 1300, 1308, 1308 n.18 (11th Cir. 2001) ("[T]he injunction furthers the public interest by insuring the continued operation of air travel on a major carrier.").

1   Injunction. This amount is appropriate because the evidence indicates that Teamsters will suffer

2   only minimal, if any, damage by the issuance of this preliminary injunction.

3         DATED this 1st day of May, 2015.

4                                              _____

5                                              ANDREW P. GORDON
                                               UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28